UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CALE McCOLLOUGH,

                Plaintiff,

     v.

PORTLAND STATE UNIVERSITY *and*
SUSAN JEFFORDS,

                Defendants.

Case No. 3:23-cv-01582-AR

**FINDINGS AND
RECOMMENDATION**

_____

**ARMISTEAD, Magistrate Judge**

      Plaintiff Cale McCollough, a former student who is representing himself, sues defendants

Portland State University (PSU) and Susan Jeffords (together, defendants) after he was

effectively expelled for protesting PSU's COVID vaccine mandate. He alleges that during his

student conduct code violation hearing, defendants (1) retaliated against him, violating the First

and Fourteenth Amendments, 42 U.S.C. § 1983, and (2) discriminated against him based on his

disability, violating the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101(b), causing

more than $2 million in psychological and emotional injuries.

Page 1 – FINDINGS AND RECOMMENDATION

The court addresses here defendants' motion to dismiss under Federal Rule of Civil Procedure 12, which contends that: (1) McCollough fails to state a claim under the ADA because he has not pleaded facts showing intentional discrimination or a failure to accommodate his alleged disability; (2) PSU has Eleventh Amendment immunity for his constitutional claims; (3) Jeffords has qualified immunity for his constitutional claims; and (4) he failed to properly serve Jeffords with the amended complaint and summons.[1] As explained below, defendants' motion should be granted.

## BACKGROUND

The relevant events occurred in 2021 and 2022. McCollough has been enrolled on and off as a student studying computer engineering at PSU since 2013.[2] At some point during his final term, he registered with PSU's Disability Resource Office as a qualified student with a disability due to his complex post-traumatic stress disorder (CPTSD). (Am. Compl. ¶ 38, ECF No. 8.) In 2021, PSU mandated that students receive the COVID mRNA vaccine, which McCollough refers to in his amended complaint as "The Mark of the Beast." (*Id.* ¶ 46.) On October 7, McCollough requested a waiver of the vaccine by email, by stating: "You can go fuck yourself you piece of shit scumbag Democrat mother fuckers. Vaccine mandates are illegal. Suck my fucking dick punk. Fuck Joe Beijing Biden and Hyena Harris." (*Id.* ¶ 48.) PSU vaccine services responded with the following message:

---

[1]     The court finds that oral argument would not be helpful in resolving the pending motion. *See* LR 7-1(d)(1).

[2]     McCollough also provides a lengthy description of his battle for the custody of his son and his previous school enrollments at Lane Community College and PSU. (Am. Compl. ¶¶ 1-45.) Those events are unrelated to his alleged expulsion.

> While we appreciate you sending in your paperwork, your email and the language used are extremely inappropriate and disruptive to our work environment, which is why we will be referring this email to the Student Conduct & Community Standards and Dean of Student Life for conduct review.
>
> You should expect outreach from their office soon. We ask that if you need to communicate with our department in the future, you do not use profanity or insults. If you fail to abide by these boundaries, you will be reported to Student Conduct & Community Standards for failing to comply with our reasonable request.
>
> Best, Susan

(*Id.* ¶ 49.)

On October 11, PSU's Erica Geller[3] issued McCollough a Student Code of Conduct violation, which said that his October 7 email "disrupted the work of the employees at the University's Student Health and Counseling Center (SHAC)." (*Id.* ¶ 51.) Geller also emailed him an invitation "for a kangaroo court trial." (*Id.*) McCollough replied by email, stating:

> I'm requesting to meet with someone who doesn't have She/They in their title. You're on[e] of those Democrats that are causing nightmares for people. I don't want to talk to you or anyone who is in the #woke mob. You want to stick a needle in my arm, you can kiss my ass.

(*Id.* ¶ 52.) On October 14, Geller denied his request:

> Unfortunately, that is not an appropriate reason for requesting an alternate hearing officer. Additionally, we require at least 24 hours['] notice to reschedule or alter the hearing in any way, and unfortunately, we are within 24 hours of the hearing time. If you are not interested in meeting via zoom for the hearing, you are welcome to submit a written statement in lieu of your attendance. The written statement should address the charges, whether you believe you are responsible/not responsible for the alleged violation in your hearing letter, and you[r] reasoning. For your convenience, I've attached the hearing letter with the charge information included.

---

[3]     McCollough refers to Geller as a "short haired feminist" and asserts that her use of she/they pronouns is a "political statement meaning you're a #woke Leftist Social Justice Warrior." (Am. Compl. ¶¶ 51-52.) Geller is not a named defendant in this lawsuit.

(*Id.* ¶ 53.) That day, McCollough responded with another statement that was as vulgar as his

prior communication:

> Your vaccine mandate is 100% illegal. You should know better, but Democrats like Kate Brown, Joe Biden, Hyena Harris, Pelosi, AOC are scum bag pieces of shit who can suck the shit out of my asshole. A US Federal Court this month ruled in favor of the Western Michigan University athletes citing that the school must take into account religious exemptions. Proof here
>
> https://www.natlawreview.com/ article/university-policy-mandating-covid-19-vaccines-student-athletes-blocked-sixth-circuit
>
> You're harassing me with the intent to assault me with a needle with some dangerous experimental vaccine. Shit-bag punk Democrats used to force-sterilize people, most non-white, stupid, retarded, and poor people. They claimed they had the right to sterilize because it was in the interest of public health. This is exactly what the scum-sucking shit-bag Democrats are claiming now. This is a deeply held offense that PSU has mandated vaccines that provokes rage and vitriol.
>
> Democrats regularly think it doesn't matter to fuck over people for not complying with their authoritarianism. Democrats have been targeting my class with hatred, hostility, violence, targeted firing, canceling, bullying, harassment. We're not taking it anymore. We're not going to be nice to you, I'll just sue you.
>
> You're the one who is trying to assault me by sticking a needle in my arm to inject me with some experimental vaccine. The problem is you haven't specified which vaccine, there are three of them plus the Chinese one. Some vaccines have more health problems than others. The rate of myocarditis hospitalizations from the COVID vaccines is higher than the rate of hospitalizations in my age group. You're trying to force me to take a vaccine that gives people heart problems that has killed over 15K people and permanently disabled over 25K people. You can expect a vitriolic response from students who have a spin. That's a religious[ly] held moral objection. You can expect people to cuss you out and tell them to suck your dick and kick your ass.
>
> The COVID vaccine is completely ineffective against the Delta variant. In fact, the vaccines killed off all the varieties of COVID strands that typically act as natural vaccines. If you do get a COVID vaccine, it will not introduce you to the proteins in the inside of the COVID virus. You're supposed to still get natural infected with COVID when you have the antibodies, and not trying a failed zero-COVID policy so you inevitably get infected after your antibodies wane. That's stupid.

> By forcing students to wear masks, you've deprived us of our right to free
> association. We have a right to associate with people with COVID so we can get
> infected and infect others. The Government is incompetent. The people best able
> to make their own medical decisions. By trying to prevent me from making my
> medical decisions, then you have assaulted me and you can prepare for a vitriolic
> response as you have deeply offended me.

(*Id.* ¶ 54.)

McCollough's response was denied on October 19. (*Id.* ¶ 55.) According to McCollough,

Geller blocked his ability to register for classes and falsely claimed he did not submit a written

statement. (*Id.*) That day, he appealed Geller's decision, saying, "I was falsely accused of

violating the bullshit Code of Conduct while I was engaging in a political protest[. PSU's]

unlawful The Mark of the Beast mandate on October 7, 2021 and [PSU] unlawfully violated my

free speech" because it did not apply the clear and convincing evidence standard. (*Id.* ¶ 56.)

McCollough further stated that he was protesting the "BS Code of Conduct" and unlawful use of

a preponderance of the evidence standard "to deprive students of their fundamentally federally

protect[ed] rights." McCollough included with his appeal a "long political protest" that he also

has attached to his amended complaint. (*Id.* ¶ 56 & App. at 31-35.)

On February 11, McCollough learned that his appeal was denied by Susan Jeffords, the

head of PSU's Code of Student Conduct Office. Jeffords' denial reads as follows:

> On October 19, you filed an appeal of Ms. Geller's decision. On your
> appeal form you indicated that an appeal should be granted because there was an
> error in the conduct process, because there is relevant information available now
> that was not available at the time of the hearing, and because the sanction was
> outside the authority of the University. In arriving at the decision below, I have
> reviewed the student conduct appeal form and the narrative statement you
> submitted with the form. I have also reviewed information from the student
> conduct file.
>
> Your appeal is DENIED for the following reasons:

Page 5 – FINDINGS AND RECOMMENDATION

The first basis of your appeal is that that you claim there was an error in the conduct process. You have not identified what that error is nor why any such error was material to the decision and process. Accordingly, this is not a basis that would support granting your appeal.

Regarding the next basis of your appeal concerning new information, you have not offered or identified any new information that was not available to you at the time of the hearing. The only information you provide in your appeal is information about your personal and political beliefs about vaccines and the legal rights and responsibilities as you understand them. This is not new information, and had you chosen to attend the hearing, you could have presented this information about your perspective. Thus, this is also not a basis to support granting the appeal.

And, finally, you allege that the sanction was outside the authority of the University. I do not concur. The University has the authority to issue the sanctions it issued here, which include probation and an educational essay. Code section XIV, para. (4) and (6).

(*Id.* ¶ 57.)

McCollough alleges that he was not informed of what part of the Code of Student Conduct he violated and contends that he was exercising his right to free speech on public property. (*Id.* ¶ 58.) In his view, the COVID vaccine was experimental and unsafe, and the vaccine mandates were forced human trials. (*Id.* ¶ 59.) The effect of PSU's sanctions was McCollough's permanent expulsion, which caused him to be depressed and suicidal. (*Id.* ¶¶ 60, 63.) McCollough has been unable to register for classes or participate in the PSU Cleantech Challenge because of his suspension. (*Id.* ¶¶ 64, 65.)

In his amended complaint,[4] McCollough asserts five claims: (1) PSU discriminated against him and failed to provide accommodations for his CPTSD as required by the ADA; (2)

---

[4]    On October 27, 2023, McCollough filed a complaint against PSU. The following week, the court issued an Order to Amend, advising him of several deficiencies in the complaint, including that his constitutional claims must be asserted through 42 U.S.C. § 1983, that PSU is

PSU violated his due process rights guaranteed by the Fourteenth Amendment when it applied the incorrect evidentiary standard in his student conduct code violation hearing; (3) PSU violated his free speech rights guaranteed by the First Amendment when it subjected him to discipline for using profanity when he submitted his vaccine waiver by email; (4)(a) Jeffords retaliated against him for engaging in political speech to protest the vaccine mandate, violating the First Amendment; (4)(b) Jeffords violated his due process rights guaranteed by the Fourteenth Amendment when she permanently suspended him, instead of suspending him for a single term, and applied the incorrect evidentiary standard; and (5) PSU violated McCollough's mother's First Amendment right to control his education when it required his mother to pay for repeat classes.

Under Rule 12(b)(6), defendants move to dismiss all five claims because: (1) PSU is immune from McCollough's § 1983 suit in federal court under the Eleventh Amendment; (2) Jeffords has qualified immunity for his § 1983 claims; and (3) he fails to state a disability discrimination claim – either for discriminatory treatment or failure to accommodate – because the facts as alleged fail to support any viable legal theory. Defendants also move to dismiss the claims against Jeffords under Rule 12(b)(5) because she was not properly served with the amended complaint. Alternatively, defendants request that McCollough be required to make his allegations more definite and certain under Rule 12(e). As explained below, because the court recommends that defendants' Rule 12(b)(6) motion be granted, it declines to address defendants' other bases for dismissal. The court begins its analysis with PSU's Eleventh Amendment

---

immune from suit under the Eleventh Amendment, and that his ADA claims lacked sufficient factual detail. (Order to Amend, ECF No. 7.) McCollough timely filed an amended complaint.

sovereign immunity and Jeffords' qualified immunity, then turns to McCollough's disability discrimination claims.

## LEGAL STANDARDS

### A.    *Pleading Sufficiency*

A court will grant a Rule 12(b)(6) motion to dismiss for failure to state a claim when a claim is unsupported by a cognizable legal theory or when the complaint is without sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). Assessing the sufficiency of a complaint's factual allegations requires the court to (1) accept that plaintiff's well-pleaded material facts alleged in the complaint are true; (2) construe factual allegations in the light most favorable to plaintiff; and (3) draw all reasonable inferences from the factual allegations in favor of plaintiff. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). A plaintiff's legal conclusions that are couched as factual allegations, however, need not be credited as true by the court. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). An entitlement to a presumption of truth does not permit allegations in a complaint to "simply recite the elements of a cause of action." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Rather, the complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Id*.

Plausibility is the plaintiff's keystone to surviving a motion to dismiss. That is, a complaint's factual allegations must "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* at 1216. "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Plausibility is not probability, but plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

**B.    *Self-Represented Litigants***

Pleadings filed by self-represented litigants must be liberally construed and are given the benefit of any doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). As the Ninth Circuit has observed, "[t]here is a good reason that we afford leeway to *pro se* parties, who appear without counsel and without the benefit of sophisticated representation: 'Presumably unskilled in the law, the *pro se* litigant is far more prone to making errors in pleading than the person who benefits from the representation of counsel.'" *Huffman v. Lindgren*, 81 F.4th 1016, 1021 (9th Cir. 2023) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (*en banc*)).

Yet the court's "liberal interpretation of a *pro se* . . . complaint may not supply essential elements of the claim that were not initially pled." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1140 (9th Cir. 2011) (*en banc*) (simplified). Dismissal without leave to amend is appropriate where it appears beyond doubt that the self-represented plaintiff can prove no set of facts that would entitle him to relief. *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007) ("Dismissal of a *pro se* complaint without leave to amend is proper only if it is absolutely clear that the deficiencies of the complaint could not be cured by amendment.").

\ \ \ \ \

\ \ \ \ \

## DISCUSSION

A.  *Claims 2, 3, and 5 Against PSU – Eleventh Amendment Immunity*

McCollough alleges violations of the First and Fourteenth Amendments against PSU under 42 U.S.C. § 1983. As PSU correctly asserts, it is immune from McCollough's § 1983 claims under the Eleventh Amendment's immunity doctrine. Under the Eleventh Amendment, states are immune from suits brought in federal court by its own citizens. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *Brainard v. W. Or. Univ.*, Case No. 3:17-cv-0253-SI, 2017 WL 1534191, at *2 (D. Or. Apr. 26, 2017). Eleventh Amendment immunity extends to public universities because they are considered "arms of the state." *Doe v. Or. State Univ.*, 614 F. Supp. 3d 847, 858 (D. Or. 2022); *accord Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 968 (9th Cir. 2010). Public universities in Oregon, including PSU, are arms of the state and, therefore, receive the benefit of Eleventh Amendment immunity. *Doe v. Or. State Univ.*, 614 F. Supp. 3d at 858; *Hagel v. Portland State Univ.*, 237 F. App'x 146, 148 (9th Cir. 2007) (holding that Portland State University was entitled to Eleventh Amendment immunity). Eleventh Amendment immunity may be overcome if the state has consented to suit or if Congress has abrogated the state's immunity. *Micomonaco v. State of Washington*, 45 F.3d 316, 319 (9th Cir. 1995) (noting the two well-established exceptions to Eleventh Amendment immunity).

McCollough argues that Eleventh Amendment immunity is inapplicable because he is pursuing constitutional claims under the First and Fourteenth Amendments and that Eleventh Amendment immunity does not apply to those claims, citing *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). *Fitzpatrick* is unhelpful here. In that case, the Supreme Court recognized that Congress

may abrogate the States' Eleventh Amendment immunity through its powers granted by § 5 of

the Fourteenth Amendment, and that to do so, it must act explicitly. *Id.* at 456; *Pennhurst*, 465

U.S. at 99 (requiring an "unequivocal expression of congressional intent" to overturn Eleventh

Amendment immunity); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) (holding

Congress may "abrogate such immunity in federal court if it makes its intention to abrogate

unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its

power under § 5 of the Fourteenth Amendment").[5] Thus, in *Fitzpatrick*, because the state

employees were pursuing claims under Title VII – a statute that explicitly waives states'

Eleventh Amendment immunity – they were permitted to recover damages and fees against the

state. *Fitzpatrick*, 427 U.S. at 450, 456-57.

 Unlike Title VII, Congress has not abrogated Eleventh Amendment immunity for claims

raised through 42 U.S.C. § 1983. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("The Court

has held that § 1983 was not intended to abrogate a State's Eleventh Amendment immunity."

(citing *Quern v. Jordan*, 440 U.S. 332 (1979))). Moreover, Oregon has not waived immunity for

§ 1983 actions in federal court.[6] *Bristol v. Peters*, Case No. 3:17-cv-00788-SB, 2018 WL

6183274, at *7 (D. Or. Nov. 27, 2018). PSU has not waived its Eleventh Amendment immunity

here.

---

[5] Defendants do not assert Eleventh Amendment immunity with respect to McCollough's
ADA disability discrimination claims.

[6] Contrary to McCollough's suggestion, the "Oregon Tort Claims Act is a waiver of
sovereign immunity but does not waive Eleventh Amendment immunity." *Estate of Pond v.
Oregon*, 322 F. Supp. 2d 1161, 1165 (D. Or. 2004); *see also Pennhurst*, 465 U.S. at 99 n.9 ("[A]
State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh
Amendment immunity in federal courts.").

McCollough also argues that he is not pursuing claims under § 1983 against PSU, and that he is asserting § 1983 claims against Jeffords only. (Pl.'s Resp. at 13, ECF No. 25.) Not so. In Claims 2, 3, and 5, he asserts that PSU has violated his First and Fourteenth Amendment rights. Because the U.S. Constitution does not provide a direct cause of action, McCollough must pursue those claims through § 1983. *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) (stating that there is "no cause of action directly under the United States Constitution" and thus "a litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983"). Accordingly, because PSU has not waived its Eleventh Amendment immunity or consented to suit for the § 1983 constitutional claims asserted here, Claims 2, 3, and 5 against PSU should be dismissed.[7]

## B.    *Claim Four Against Jeffords*

### 1.    **Official Capacity**

Generally, state officials sued in their official capacities also are entitled to Eleventh Amendment immunity, unless waived. *Kentucky v. Graham*, 473 U.S. at 166 (holding that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"). There are, however, two circumstances where state officials may be liable under § 1983. First, a plaintiff may seek damages against state officials for actions taken in their personal capacity. *Id.* at 165 ("Personal-capacity suits seek to impose personal liability upon a government official for

---

[7]    In Claim 5, McCollough contends that PSU violated his mother's First Amendment right to control McCollough's education. (Am. Compl. ¶ 80.) Although persons may represent themselves in federal court, they may not represent any other person or entity. Thus Claim 5 also should be dismissed because McCollough, as a self-represented litigant, may not seek to vindicate his mother's rights in this lawsuit. *C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987) (providing that self-represented litigant may not appear as an attorney for others in federal court).

actions he takes under color of state law."); *Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022) (same). "Second, state officials are 'persons' under § 1983 when sued for prospective injunctive relief." *Cornel*, 37 F.4th at 531 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)). The prospective injunctive relief exception, called the *Ex parte Young*[8] doctrine, "applies where a plaintiff 'alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective.'" *Id.* (quoting *Doe v. Lawrence Livermore Nat'l Lab'y*, 131 F.3d 836, 839 (9th Cir. 1997)).

Because PSU has not waived its Eleventh Amendment immunity, to the extent that Jeffords is sued in her official capacity, PSU's immunity extends to Jeffords. Although Jeffords could be subject to suit under *Ex Parte Young*, McCollough identifies no ongoing violation of federal law to enjoin. In his prayer for relief, McCollough states that he is seeking declaratory and injunctive relief, in addition to damages. (Am. Compl. at 30.) The only declaratory and injunctive relief he identifies, however, is a decree stating that the clear and convincing evidentiary standard applies to student conduct hearings. (*Id.* ¶ 84; Pl.'s Resp. at 5.) As noted below, there is no federal right to a clear and convincing evidentiary standard in those hearings. Consequently, there is no ongoing violation of federal law to enjoin. Therefore, Claim 4 is limited to damages against Jeffords in her personal capacity.

## 2.    Personal Capacity

McCollough asserts that Jeffords: (1) violated his Fourteenth Amendment due process right to be suspended for a single term instead of indefinitely for protesting the vaccine mandate;

---

[8]    *Ex Parte Young*, 209 U.S. 123 (1908).

(2) violated his Fourteenth Amendment due process right to have his student conduct code violation hearing resolved under a clear and convincing evidentiary standard; and (3) retaliated against him for exercising his First Amendment Free Speech and Petition Clause rights to tell PSU to "suck his dick" when requesting a vaccine waiver. In his responsive briefing, McCollough contends that Jeffords retaliated against him because he was protesting the vaccine mandate, not because he used profanity and vulgar language. (Pl.'s Resp. at 27.) McCollough also argues that his vaccine exemption request is protected by the First Amendment because he did not "substantially disrupt" PSU's processing of his request, citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). (Pl.'s Resp. at 22.) According to McCollough, Jeffords knew she was violating his due process rights when she applied a preponderance of the evidence instead of a clear and convincing standard to the disciplinary process, citing *Troxel v. Granville*, 530 U.S. 57 (2000), *Santosky v. Kramer*, 455 U.S. 745 (1982), and *Khan v. Yale Univ.*, 85 F.4th 86 (2d Cir. 2023). (Pl.'s Resp. at 5-6, 9, 11.) For all those reasons, McCollough contends, Jeffords is not entitled to qualified immunity.

Jeffords responds that McCollough's First Amendment retaliation claim (Claim 4(a)) fails because his alleged facts do not plausibly show that he was engaged in activity protected by the Free Speech Clause or the Petition Clause. McCollough's alleged due process claim (Claim 4(b)) fails, in Jeffords' view, because his alleged facts do not plausibly show that her personal involvement undermined his opportunity for notice and right to be heard or violated a fundamental right. Furthermore, Jeffords argues, even if McCollough has plausibly alleged a constitutional violation, none of those rights was "clearly established" at the time of the alleged violation in 2021, and she is entitled to qualified immunity.

### 3.    Qualified Immunity – Standards

Officials sued in their personal capacities are entitled to qualified immunity from suits for damages. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015). "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Gordon v. County of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "Qualified immunity shields . . . state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1122 (9th Cir. 2023); *Doe v. Or. State Univ.*, 614 F. Supp. 3d at 589 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Both prongs are required to overcome qualified immunity and the court has discretion to consider them in any order. *Pearson*, 555 U.S. at 237, 241; *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ("Courts should think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." (simplified)).

"A constitutional right is clearly established if every reasonable official would have understood that what he is doing violates that right at the time of his conduct." *Sampson v. County of Los Angeles ex rel. L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018-19 (9th Cir. 2020) (quotation marks omitted). Whether the law was clearly established at the time of the alleged violation is a purely legal question for the court. *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017); *Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003). The Supreme Court has

repeatedly instructed that courts may "not define clearly established law at a high level of generality." *Sheehan*, 575 U.S. at 613 (quoting *Ashcroft v. Kidd*, 563 U.S. at 742). "In the Ninth Circuit, we begin [the clearly established] inquiry by looking to binding precedent. If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023); *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (absent binding precedent, courts should examine other circuit opinions and district court decisions); *cf. Smith v. Agdeppa*, 81 F.4th 994, 1005 (9th Cir. 2023) (observing that the Ninth Circuit is hesitant to rely on district court decisions to define "clearly established law" because they "do not necessarily settle constitutional standards").

Although there need not be a case directly on point, existing precedent must have placed the constitutional question "beyond debate." *Sheehan*, 575 U.S. at 611 ("This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (simplified)); *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (per curiam). "To determine whether a constitutional right has been clearly established, [the court] must "survey the legal landscape and examine those cases that are most like the instant case." *Grabowski*, 69 F.4th at 1122-23 (simplified).

### 4.      Qualified Immunity – Analysis

The court addresses each of McCollough's alleged violations separately.

*Length of suspension*: McCollough argues that he "gave money that was their property to Defendant PSU for mandatory tuition and enrollment fees, and the State cannot take that money without Due Process of Law." (Pl.'s Resp. at 18.) The due process clause of the Fourteenth

Amendment protects against the deprivation of liberty or property without due process of law. *Goss v. Lopez*, 419 U.S. 565, 572 (1975). To succeed on this type of procedural due process claim, McCollough must establish he has a liberty or property interest protected by the Constitution, a deprivation of that interest, and lack of process. *Shanks v. Dressell*, 540 F.3d 1082, 1090 (9th Cir. 2008). McCollough argues that Jeffords violated his due process rights by suspending him for longer than a single term. In other words, the discipline Jeffords imposed resulted in his indefinite suspension, which in McCollough's view, violates due process.

McCollough does not cite, and this court could not locate, binding precedent clearly establishing that higher education students have a due process right to a particular disciplinary sanction in the university setting. As other courts have observed, neither the Supreme Court nor the Ninth Circuit have squarely addressed whether university students have a property or liberty interest protected by the due process clause in their continued enrollment in higher education. For example, in *Doe v. White*, 440 F. Supp. 3d 1074, 1084-85 (N.D. Cal. 2020), after exhaustively examining the issue, the court concluded that the plaintiff failed to show that she had a clearly established due process liberty or property interest in her continued enrollment in public university:

> There are no binding Supreme Court or Ninth Circuit cases establishing such a right, and a number of district courts within the Ninth Circuit have recognized that there is a "dearth" of case law on the subject, with several recent decisions finding school officials entitled to qualified immunity. Looking outside the Ninth Circuit, there is no "robust consensus" holding that students have a protected property or liberty interest in continued enrollment in higher education at a public college or university.

*Id.* at 1089 (collecting and discussing cases). Because that right was not "beyond debate," the *White* court dismissed the claims against the school officials on qualified immunity grounds. *Id.*

Page 17 – FINDINGS AND RECOMMENDATION

Courts within this district similarly have concluded that there is no clearly established due process right to higher education or continued university or college enrollment, and consequently, have found school officials entitled to qualified immunity. *See, e.g.*, *Doe v. Or. State Univ.*, 614 F. Supp. 3d at 859 (concluding plaintiff did not demonstrate clearly established property interest in his continued enrollment at university; school officials entitled to qualified immunity; collecting cases); *Brady v. Portland State Univ.*, Case No. 3:18-cv-01251-HZ, 2019 WL 4045652, at *4-6 (D. Or. Aug. 23, 2019) (discussing that there is no clearly established property right to higher education or continued enrollment; school officials entitled to qualified immunity; collecting cases); *Doe v. Univ. of Or.*, Case No. 6:17- CV-01103-AA, 2018 WL 1474531, at *14 (D. Or. Mar. 26, 2018) (no clearly established federal due process right to continued enrollment in public university; school officials entitled to qualified immunity; collecting cases); *Andrews v. Treasure Valley Cmty. Coll.*, Case No. 2:19-CV-01314-SU, 2020 WL 1678050, at *5 (D. Or. Mar. 18, 2020) ("Given the divided state of opinion among the courts of this District and the lack of clear guidance from the Ninth Circuit," student did not have a clearly established property interest in continued enrollment). *See also Grabowski*, 69 F.4th at 1122-23 (holding no clearly established property right in athletic scholarship; coaches entitled to qualified immunity); *Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1221-22 (D. Or. 2016) (concluding no clearly established due process right to continued athletic scholarship at public university, finding school officials entitled to qualified immunity), *aff'd*, 925 F.3d 1133, 1139 (9th Cir. 2019) (assuming without deciding that due process right existed, but concluding that no due process violation occurred). Therefore, based on the court's review of the case law, there is no clearly established right to continued enrollment at PSU such that McCollough's purported

Page 18 – FINDINGS AND RECOMMENDATION

right to be suspended for just one term for violating the student conduct code was "beyond debate." Accordingly, Jeffords is entitled to qualified immunity.

*Evidentiary Standard at Disciplinary Hearing*: McCollough argues that he was deprived of his due process right to have his student conduct code violation hearing be determined by a clear and convincing evidentiary standard, relying on *Troxel*, 530 U.S. 57. According to McCollough, because he was asserting fundamental rights, a heightened evidentiary standard was required. The court disagrees.

As argued by defendants, *Troxel* involved a nonparental visitation statute and the *Troxel* court determined that the due process clause provides "heightened protection against government interference with certain fundamental rights and liberty interests," such as parents' rights to make decisions about the "care, custody, and control of their children." *Id.* at 65. McCollough's disciplinary hearing did not involve his parental rights, and thus *Troxel* is inapt. His reliance on other cases similarly misses the mark. For example, *Santosky*, 455 U.S. at 753-54, and *Scanlon v. County of Los Angeles*, 92 F.4th 781, 797-98 (9th Cir. 2024), discuss the high burden that is placed on the state when removing children from parental custody. Those cases relating to child custody and visitation simply do not dictate an evidentiary standard for use in higher education student disciplinary proceedings.

McCollough's citation to *Khan*, 85 F.4th 86, is unhelpful. In that case, Khan was expelled after a disciplinary hearing concerning an accusation of an on-campus rape in 2015. Khan then sued Yale University and the alleged victim. The *Khan* court focused on whether the victim's statements made during the disciplinary hearing were entitled to absolute or qualified immunity. *Id.* at 88. After certifying questions to the Connecticut Supreme Court, the Second Circuit

concluded that disciplinary hearing was not a quasi-judicial proceeding, and that because Khan sufficiently pleaded malice, the court could not determine whether the victim was entitled to qualified immunity on the face of the pleadings. *Id.* at 89. Importantly, *Khan* did not discuss or establish that a clear and convincing evidentiary standard must be applied to a higher education student disciplinary hearing.

The court did not discover, and McCollough does not identify, case law establishing that a clear and convincing evidentiary standard applies to student disciplinary hearings for conduct analogous to the circumstances alleged by him.[9] Consequently, application of a clear and convincing standard was not clearly established and "beyond debate," and Jeffords is entitled to qualified immunity on this claim. *Sheehan*, 575 U.S. at 611.

*Using Profanity in Vaccine Waiver Request*: McCollough argues that his statements telling PSU to "suck his dick," among other profane and vulgar statements, is protected by the

---

[9]    Most cases have concluded the opposite – that due process does not require application of a clear and convincing evidentiary standard to university disciplinary hearings. Notably, the question of the appropriate evidentiary standard has arisen most frequently in the context of student-on-student sexual assault where alleged perpetrators are facing expulsion. *See Doe v. Univ. of Ark. – Fayetteville*, 974 F.3d 858, 868-69 (8th Cir. 2020) (holding application of preponderance of evidence standard in student disciplinary proceeding for sexual assault accusation did not violate due process; "we do not think a higher standard of proof is compelled by the Constitution"); *Doe v. Cummins*, 662 F. App'x 437, 449 (6th Cir. 2016) (holding that university's application of preponderance standard in sexual assault disciplinary proceeding was "constitutionally sound and does not give rise to a due-process violation"); *Lee v. Univ. of N.M.*, 500 F. Supp. 3d 1181, 1249-52 (D.N.M. 2020) (concluding that "due process does not require universities evaluating sexual misconduct allegations to apply a clear and convincing evidentiary standard" and observing that "[n]o federal courts have concluded that students are entitled to anything more than a preponderance-of-the-evidence standard in sexual misconduct [university student] disciplinary proceedings"); *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1167 (D. Colo. 2020) ("Thus far, it appears that no federal court has concluded that students accused of sexual assault are entitled to a standard of proof requiring 'clear and convincing' evidence in disciplinary proceedings.").

Page 20 – FINDINGS AND RECOMMENDATION

First Amendment's Free Speech and Petition Clauses. (Pl.'s Resp. at 4 ("Cale has a right to associate with PSU's staff and to put forward the idea for them to suck his fucking dick.").) According to McCollough, he was engaged in a political protest when he emailed his COVID vaccine exemption request, and Jeffords retaliated against him for exercising those rights when she disciplined him. Because he made the statements in emails, in McCollough's view, his statements did not substantially disrupt PSU's processes or impinge on the rights of other students and were not sanctionable, as stated in *Tinker*.[10] (Pl.'s Resp. at 22-24.)

McCollough cannot overcome Jeffords' qualified immunity here for two reasons: (1) he has not sufficiently alleged an improper motive to establish a First Amendment retaliation claim, and (2) his alleged right to use profanity and vulgar language in an email to university personnel is not clearly established.

To establish a First Amendment retaliation claim, McCollough must demonstrate that (1) he "engaged in constitutionally protected activity"; (2) Jeffords took "adverse action" against him that "would chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) there was "a substantial causal relationship between the constitutionally protected activity and the adverse action." *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)). "Motive is a necessary element of a retaliation claim." *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019) (simplified)

---

[10]    McCollough also contends that sanctions for his email violated his Free Press rights because he is a "bona fide Intellectual Dark Web journalist who runs a news organization that has reported ex[t]ensively on the COVID vaccine mRNA blood clot deaths." (Pl.'s Resp. at 27.) McCollough's amended complaint does not include a Free Press claim or mention that he is a journalist. Even if it did, a First Amendment retaliation claim based on those facts would fail because he does not allege facts to show that Jeffords knew that he was dark web journalist and that she disciplined him to shut down his reports about COVID vaccine deaths.

(quoting *Ariz. Students Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016)). Thus, the retaliatory motive must *cause* the injury – that is, "the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019). "At the pleading stage, the complaint must simply allege 'plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct[,]' and motive may be shown with direct or circumstantial evidence." *Koala*, 931 F.3d at 905.

McCollough's amended complaint alleges that Geller retaliated against him because she is a "short haired feminist" who uses she/they pronouns and is a "#woke Leftist Social Justice Warrior." (Am. Compl. ¶¶ 50-52.) Broadly viewing McCollough's arguments, he contends that Jeffords is a Democrat and that she disciplined him because she was "politically opposed" to his Republican views, was his "political enemy," and wanted to retaliate against "Republicans for opposing the mask and Mark of the Beast COVID mRNA vaccine mandate." (Pl.'s Resp. at 28.) McCollough asserts that 98 percent of PSU professors donate money to the Democratic party, and that PSU was acting on behalf of the Democratic party. (Am. Compl. ¶ 61.)

Even taking those allegations as true, McCollough does not allege any facts that plausibly could support a direct or circumstantial nexus between Jeffords and the Democratic party, her alleged opposition to him as a Republican, to Republicans generally, or to Republican opposition to the COVID mask and vaccine requirements. McCollough offers no statements made by Jeffords – or any specific PSU personnel – linking them to negative statements about him, Republicans, or vaccine mandates. Aside from the temporal proximity between McCollough sending the October 7, 2021 email and his suspension, McCollough's allegations of a retaliatory motive rest on pure speculation and surmise, which is insufficient to withstand a motion to

dismiss. *Twombly*, 550 U.S. at 555 (holding that "[f]actual allegations must be enough to raise a right to relief above the speculative level"); *cf. Koala*, 931 F.3d at 905 (holding allegations that statement from university chancellor denouncing publication as repulsive and cruel, that administrator encouraged action to defund publication, and statement from vice chancellor that publication was being singled out for special treatment sufficiently alleged retaliatory motive). Because McCollough has not pleaded plausible circumstances connecting Jeffords' alleged retaliatory intent to his suspension, he has not alleged a First Amendment retaliation claim.

Next, McCollough does not identify, nor has the court located, clearly established authority that prohibits Jeffords conduct. Thus, it would not have been clear to a reasonable person in Jeffords' position that disciplining him for communicating with university officials using profanity, vulgar language, and insults in the context of a private email was unlawful.[11] To the court's knowledge, at the time of disciplinary action here, neither the Supreme Court nor the Ninth Circuit had determined that a university could not discipline students for lewd, offensive statements or profanity used in private, written communications to university personnel that it deemed violated its code of conduct.

McCollough's reliance on *Tinker* is misplaced. In *Tinker*, the Supreme Court determined that high school students could wear armbands to engage in a nondisruptive, passive political expression, determining that the students' speech did not "materially and substantially intrude upon the work of the school." 393 U.S. at 513. In McCollough's view, because his speech occurred in an email to vaccine services, Jeffords could not discipline him because he did not "substantially disrupt" any activities at PSU.

---

[11]     McCollough does not directly challenge PSU's Student Conduct code provision.

Page 23 – FINDINGS AND RECOMMENDATION

The court disagrees that *Tinker* is controlling here. The "First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985) ("Even protected speech is not equally permissible in all places and at all times."). Courts have limited expressive activity by students depending on "the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) (holding that interschool mail system was not a public forum, and government may "draw distinctions which relate to the special purpose for which the property is used" without violating the First Amendment).

And the Supreme Court has concluded that "[n]othing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). In *Fraser*, the court found it constitutionally permissible for high school officials to discipline a student for making lewd, sexually explicit, and vulgar comments during an assembly. "The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as [the student's] would undermine the school's basic educational mission." *Id.* at 685. This sentiment was echoed in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988), where the Court observed that "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Id.* at 266.

In *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180 (2021), the Supreme Court addressed lewd speech when high school officials suspended a high school student from the

Page 24 – FINDINGS AND RECOMMENDATION

cheerleading squad for using vulgar language in a social media post. There, the Court determined

that the school's "anti-vulgarity interest" was "weakened considerably by the fact that B.L. spoke

outside the school on her own time," and concluded that a First Amendment violation occurred.

*Id.* at 192.

However, courts have struggled to apply the tenets of *Tinker*, *Fraser*, and other high

school student speech cases to university campuses. The Ninth Circuit has recognized that those

cases do not provide an adequate framework for considering speech in a public university

setting. *Oyama v. Univ. of Hawaii*, 813 F.3d 850, 862-64 (9th Cir. 2015) (observing that student

speech cases have not been extended to a "public university setting," and that university's

decision to deny student teaching application based on student's statements did not violate First

Amendment); *see also Harrell v. S. Or. Univ.*, Case No. 08-3037-CL, 2009 WL 3562732, at *9

(D. Or. Oct. 30, 2009) (denying preliminary injunction, finding disrespectful online classroom

speech was not connected to student's political views and could be disciplined by university;

student conduct policy did not violate First Amendment rights), *aff'd*, 381 F. App'x 731 (9th Cir.

2010).

Other circuits that have grappled with the application of *Tinker* and other school speech

cases in university environments likewise have found no clear guidance. Given the absence of

clear authority, it is unsurprising that those courts have granted qualified immunity to university

officials in such situations. *See Radwan v. Manuel*, 55 F.4th 101, 120-22 (2d Cir. 2022)

(discussing student speech cases, observing that "courts have not hesitated to grant qualified

immunity to university officials who attempt to regulate speech at the university level in the

uncertain waters of *Hazelwood*, *Fraser*, and other Supreme Court precedent") (collecting cases);

*Sasser v. Bd. of Regents of Univ. Sys. of Ga.*, Case No. 21-14433, 2023 WL 2446720, at *5 (11th Cir. 2023) ("Still, it is not clear to what extent *Tinker* applies to the university setting, making it all the more obvious that the law in this area is not so clearly established to put the individual Defendants on notice so as to defeat qualified immunity."); *Hunt v. Bd. of Regents of Univ. of N.M.*, 792 F. App'x 595, 602 (10th Cir. 2019) (granting qualified immunity to medical school administrator, holding that "decisions from our court and other circuits have not bridged the unmistakable gaps in the case law," including whether and in what circumstances *Tinker* applies to higher education settings); *see also Yeasin v. Durham*, 719 F. App'x 844, 850-51 (10th Cir. 2018) (holding university official had qualified immunity; no clearly established law concerning university's discipline of student who posted tweets harassing another student, noting "[a]t the intersection of university speech and social media, First Amendment doctrine is unsettled"). *But see Diei v. Boyd*, 116 F.4th 637, 649-50 (6th Cir. 2024) (holding on motion to dismiss that university officials did not have qualified immunity for disciplining student for social media posts made under pseudonym unrelated to field of study that had no disruptive effect).

Accordingly, Jeffords is entitled to qualified immunity because it was not clearly established that McCollough could not be disciplined for using profanity, insults, and offensive language when communicating by email with university personnel. *See Anderson*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

In summary, McCollough's First Amendment retaliation claim should be dismissed because he has not alleged any facts from which it can reasonably be inferred that Jeffords acted with a retaliatory motive. Further, even if Jeffords violated his rights, as alleged, those rights

were not clearly established at the time of the alleged violation and she is entitled to qualified immunity.

**C.**     *Disability Discrimination – Claim 1*

**1.**     **Pleading Requirements**

Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[12] To prove that an exclusion or denial of a benefit of a public program or service violated Title II of the ADA, McCollough must show that: "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g en banc* (Oct. 11, 2001)). Because McCollough seeks monetary damages, he also must "clear an additional hurdle," and establish intentional discrimination by defendants. *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 969 (9th Cir. 2021). To do so, he must show "that the

---

[12]     Title II of the ADA was modeled after § 504 of the Rehabilitation Act, which "similarly prohibits disability discrimination by recipients of federal funds." *Payan v. L.A. Comm. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021); 29 U.S.C. § 794. ADA and Rehabilitation Act claims are analyzed together because the statutes provide identical remedies, procedures, and rights. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018); *Payan*, 11 F.4th at 737 (stating that the laws are "interpreted coextensively" because they are not significantly different). McCollough does not allege claims under the Rehabilitation Act.

defendant intended to discriminate on the basis of his or her disability, or was deliberately

indifferent to the disability." *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451,

466 (9th Cir. 2015) (citing *Duvall*, 260 F.3d at 1139). "Deliberate indifference requires both

knowledge that a harm to a federally protected right is substantially likely, and a failure to act

upon [that] likelihood." *Duvall*, 260 F.3d at 1139.[13] The "knowledge" requirement is met if a

plaintiff informs the defendant about the need for an accommodation, "or where the need for

accommodation is obvious, or required by statute or regulation." *Id.*

Disability discrimination claims may be based on three theories: (1) disparate treatment,

(2) disparate impact, or (3) failure to accommodate. *Payan*, 11 F.4th at 738; *Colasanti v. City of

Portland*, Case No. 3:19-cv-00443-YY, 2021 WL 4317286, at *11 (D. Or. Aug. 19, 2021),

*adopted by* 2021 WL 4317667 (Sept. 20, 2021).

### 2.    Analysis

Broadly reading McCollough's complaint, he advances three separate ADA claims

against PSU. One, McCollough alleges that PSU intentionally discriminated against him during

the student disciplinary hearing based on his CPTSD, which causes him to be rude and use

offensive language, and that PSU expelled him based on his disability. (Am. Compl. ¶ 66.) Two,

he alleges that PSU failed to provide reasonable accommodations during his disciplinary hearing.

And three, PSU discriminated against him by charging him full-price tuition multiple times to

---

[13]    Emotional distress damages likely are not recoverable under Title II of the ADA.
*Cummings v. Premier Rehab Keller*, 596 U.S. 212, 229-30 (2022) (holding that emotional
distress damages are not available under the Rehabilitation Act); *Wolfe v. City of Portland*, Case
No. 3:20-cv-1882-SI, 2022 WL 2105979, at *6 (D. Or. June 10, 2022) (stating that compensatory
damages are not available absent showing of deliberate indifference, and emotional distress
damages are not available under Rehabilitation Act and unlikely recoverable under ADA).

retake classes and failing to provide adequate psychological help for the emotional injuries that it caused. (*Id.* ¶¶ 68-69.)

PSU argues that, even presuming that McCollough is a qualified student with a disability, his various claims necessarily fail because he has not alleged and cannot establish that PSU acted intentionally – which requires him to show that it was deliberately indifferent to his disability-based needs. Because he has not plausibly alleged deliberate indifference under any theory, in PSU's view, McCollough's ADA claims must be dismissed. The court agrees.

### a.    failure to train—intentional discrimination

Under this theory, McCollough alleges that his CPTSD causes him to use offensive language, and that he was expelled for using offensive language in his vaccine exemption request. McCollough argues that PSU intentionally discriminated against him because it knew that he suffered from CPTSD because he was registered as a student with a disability. (Am. Compl. ¶ 38.) According to McCollough, his CPTSD causes him to be rude and use offensive language, and PSU was deliberately indifferent to his disability during the disciplinary hearing process because PSU failed to train its student conduct officers "to ask students accused of disruptive behavior in proceedings [if he] had a disability that caused the communication barrier of saying [ ] offensive language." (*Id.* ¶ 67; Pl.'s Resp. at 6.)

As argued by defendants, even if McCollough sufficiently pleaded the other elements to state a disability discrimination claim, he fails to plausibly assert that defendants were deliberately indifferent to his disability-based needs in the student conduct hearing process. To establish deliberate indifference, McCollough argues that defendants knew of his disability because he registered with the PSU Disability Resource Office in 2021 and that PSU failed to

Page 29 – FINDINGS AND RECOMMENDATION

train student conduct hearings officers to ask disruptive students if they have disabilities that cause communication barriers or cause them to use offensive language. (Pl.'s Resp. at 6-7.)

Although the Ninth Circuit has not held that plaintiffs must utilize the *Monell*[14] framework to bring an ADA failure-to-train claim, district courts analyzing such claims have done so. *See Williams v. County of Los Angeles*, Case No. 23-55155, 2024 WL 2862587, at *2-3 (9th Cir. June 6, 2024) (mem.) (applying *Monell* framework to ADA failure-to-train claim); *Mayfield v. City of Mesa*, Case No. CV-22-02205-PHX-JAT, 2023 WL 7018051, at *7 (D. Ariz. Oct. 25, 2023) (observing that Ninth Circuit has not dictated framework for analyzing ADA failure-to-train claims; applying *Monell*) (citing *O'Doan v. Sanford*, 991 F.3d 1027, 1038 n.1 (9th Cir. 2021)), *appeal filed* (Nov. 1, 2023); *Robertson v. Millett*, Case No. CV-22-00009-PHX-GMS, 2022 WL 16571702, at *5-6 (D. Ariz. Nov. 1, 2022) (same); *Estate of Jackson v. City of Modesto*, Case No. 1:21-cv-0415 AWI EPG, 2021 WL 4819604, at *11 (E.D. Cal. Oct. 14, 2021) (collecting ADA failure-to-train cases); *accord J.V. ex rel C.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1297-98 & n.4 (10th Cir. 2016) (stating that ADA failure-to-train claims have required "stringent proof to establish deliberate indifference" and collecting cases).

---

[14]    *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Supreme Court held in *Monell* that a municipal entity can be liable as a "person" under § 1983 if a plaintiff shows that the constitutional violation complained of was caused by "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019). To establish *Monell* liability, the plaintiff must plausibly allege that (1) he was deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiff's constitutional rights; and (4) the policy, custom, or practice was the "moving force" behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

Under that framework, a plaintiff must show: (1) the existing training program is inadequate in relation to the tasks the employees must perform; (2) the failure to train amounts to deliberate indifference to the plaintiff's rights; and (3) the inadequacy of the training caused a violation of his ADA rights. *See Robertson*, 2022 WL 16571702, at *5 (describing *Monell* requirements in ADA failure-to-train claim); *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (setting out elements of § 1983 failure to train claim under *Monell*) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). In such cases, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011); *see also Williams*, 2024 WL 2862587, at *2-3 (holding that appellants did not identify pattern of other violations necessary under *Monell* framework to plausibly allege ADA failure-to-train claim). Additionally, to show deliberate indifference, the alleged conduct must be "more than negligent" and involve "an element of deliberateness." *Duvall*, 260 F.3d at 1139.

McCollough's allegations fail to state a plausible ADA failure-to-train claim. McCollough points to, in his amended complaint or briefing, no other instances putting PSU on notice that student conduct code hearings officers needed more, better, or different training with respect to disciplinary hearings involving disabled students. He has not identified a single other disciplinary hearing involving disruptive students, communication barriers, or students using offensive language. Instead, his allegations are premised solely on PSU's alleged failure in his own case. Therefore, McCollough has not alleged a pattern of ADA violations necessary to establish deliberate indifference under a failure-to-train theory. Absent those allegations, he fails

to plausibly allege that PSU failed to adequately train its disciplinary hearings officers to ask about communication barriers.

### b.    failure to accommodate

McCollough argues that PSU failed to accommodate his CPTSD "by not offering disability accommodations and a translator to translate the offensive speech into language that the PSU Code of Student Conduct Office wanted to see." (Pl.'s Resp. at 7-8.) To establish this type of failure to accommodate claim, McCollough must show that: (1) he needed an "offensive language translator" during the disciplinary process; (2) PSU was on notice that he needed an "offensive language translator"; and (3) that an "offensive language translator" is a reasonable accommodation. *See Mark H. v. Hamamoto*, 620 F.3d 1090, 1097-98 (9th Cir. 2010) (discussing elements of disability discrimination claim based on failing to provide reasonable accommodation in public education setting). The reasonableness of an accommodation "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to [enjoy meaningful access to the program]." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (quotation marks omitted). An accommodation is reasonable if it is "reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). Even presuming that an "offensive language translator" could qualify as reasonable, this claim fails because McCollough has not alleged facts showing deliberate indifference.

Deliberate indifference has two parts – knowledge and a failure to act. *Duvall*, 260 F.3d at 1138-39 ("Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood."). To show deliberate

indifference by failure to accommodate, "a plaintiff must first show that the public entity was on notice of the need for an accommodation." *Csutoras*, 12 F.4th at 969. As the Ninth Circuit has recognized, "[n]otice is usually provided when the plaintiff has *alerted* the public entity to his need for accommodation (or where the need for accommodation is *obvious*, or *required* by statute or regulation)." *Id.* (simplified). Under the second part, "a failure to act must be a result of conduct that is more than negligence, and involves an element of deliberateness." *Duvall*, 260 F.3d at 1139.

McCollough has not alleged facts from which the court can infer deliberate indifference. Although he asserts that he registered with PSU's Disability Resource Office as a student with CPTSD in his final term (Am. Compl. ¶ 38), at best, that could show negligence. As argued by PSU, that bare allegation does not support an inference that PSU knew he needed an "offensive language translator" during the disciplinary process. *See Csutoras*, 12 F.4th at 969 (concluding that school did not act with deliberate indifference because no accommodations related to social interactions, bullying, or harassment were requested). McCollough does not allege that Geller, Jeffords, or any other PSU employee involved in his disciplinary process was aware that he registered with PSU's Disability Resource Office, or that anyone from the Disability Resource Office informed Geller, Jeffords, or any other PSU employee involved in his disciplinary process about his CPTSD. And McCollough concedes that he "never brought up his disability status" during that process. (Pl.'s Resp. at 8.)

Moreover, the amended complaint lacks facts from which the court can infer that his need for an "offensive language translator" during the disciplinary hearing process was "obvious." McCollough did not personally attend the hearing and he responded to the disciplinary charges in

writing. Therefore, even if an "offensive language translator" could be a reasonable accommodation (unlikely), McCollough has not alleged plausibly that his need for accommodations was obvious, and he thus fails to allege deliberate indifference.

Given that, McCollough does not plausibly allege how his "communication barrier" of using offensive language in his various written communications was known or would have been obvious to PSU's student conduct hearings officers. The court is unaware – and McCollough does not identify – any regulations requiring officers in student disciplinary hearings to inquire whether offensive language appearing in written requests and statements might be disability-based and require accommodations. Finally, his written statement also exposes McCollough's comprehension that his use of vulgar and offensive language was purposeful, and not a disability-based communication barrier. McCollough wrote that considering the vaccine mandate, PSU should expect "a vitriolic response," that "we're not going to be nice to you," and to "expect people to cuss you out and tell them to suck your dick and kick your ass." (Am. Compl. ¶ 54.) Accordingly, McCollough has not plausibly alleged that PSU knew that his offensive language leading to his discipline resulted from deliberate indifference to his disability-based needs. Thus, McCollough's allegations fall far short of pleading deliberate indifference.

### c.    retaking classes at full price

McCollough also argues that PSU violated the ADA when it charged him full-price tuition for retaking classes that he failed multiple times. (Am. Compl. ¶ 68.) According to McCollough, his CPTSD caused him to fail classes, which he then had to retake. PSU has charged him full price tuition for those classes, leaving him "financially crippled" because of the high tuition cost and mandatory enrollment fees. (*Id.* ¶69.) Because financial aid only covers so

many classes per term, in McCollough's view, PSU is preventing him from fully participating in the program based on his disability. (*Id.*) In his briefing, McCollough asserts that PSU cannot charge "disabled people more money than non-disable[d] people for the same degree and prevent them from graduating." (Pl.'s Resp. at 8.) He argues that he was charged twice for the same course (CS 252) because he broke his leg and will need to retake the class. (*Id.* at 9.)

Although not explicitly stated, the court understands McCollough to be alleging that because of his disabled status, he is entitled to reduced tuition or should be relieved of the obligation to retake classes. This theory fails to state a plausible ADA discrimination claim for multiple reasons. First, McCollough has not alleged that the accommodation of reduced tuition is reasonable. "Generally, public entities must 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Pierce v. County of Orange,* *526 F.3d 1190, 1215 (9th Cir. 2008).* Under the ADA, "an educational institution is not required to make fundamental or substantial modifications to its program or standards; it need only make reasonable ones." *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1046 (9th Cir. 1999). Second, McCollough does not allege that he has requested reduced tuition or that he be relieved from retaking classes and that his requests have been denied. And third, he fails to allege how PSU's charging full tuition or requiring him to retake classes demonstrates deliberate indifference. Again, to recover monetary damages, he must prove PSU acted intentionally. *Duvall*, 260 F.3d at 1138-39 (plaintiff must show that failure to act was more than negligence; it must involve "an element of deliberateness"). Because McCollough fails to plausibly allege that

Page 35 – FINDINGS AND RECOMMENDATION

PSU was deliberately indifferent when it required him to pay for retaking classes that he did not pass, this claim based on this theory should be dismissed.

In summary, McCollough has failed to plausibly plead that PSU acted with deliberate indifference under any disability discrimination theory he advances. Accordingly, Claim 1 should be dismissed.

**D.    *Leave to Amend***

"Leave to amend should be granted unless the pleading could not possibly be cured by the allegation of other facts, and should be granted more liberally to *pro se* plaintiffs." *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1099 (9th Cir. 2004) (quotation marks omitted). However, where a court previously has provided an opportunity to amend, district courts have wide discretion in deciding whether to subsequently grant leave. *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

The court previously provided McCollough with an opportunity to amend his complaint and cure deficiencies. As discussed above, PSU and Jeffords are entitled to Eleventh Amendment immunity and qualified immunity, respectively. Because those claims cannot be cured by amendment, leave to amend them would be futile. *Carrico v. City and County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011). Concerning his disability discrimination claims, plaintiff concedes that he "never brought up his disability status" in his disciplinary hearing and, given that admission, he presents no facts from which it plausibly may be inferred that defendants acted with deliberate indifference to establish a claim for damages under the ADA theories he advances. Consequently, leave to amend should be denied. *Weilburg*, 488 F.3d at 1205 ("Dismissal of a *pro se* complaint without leave to amend is proper only if it is absolutely clear

that the deficiencies of the complaint could not be cured by amendment."); *see also Ritchie v. Staton*, Case No. 03:17-cv-00844-AC, 2018 WL 2276241, at *8 (D. Or. Mar. 28, 2018) (denying leave to amend complaint where plaintiff could not cure pleading deficiencies "because to do so would require him to amend his complaint with facts directly contrary to those he has pleaded in his first two complaints"), *adopted by* 2018 WL 2248450 (D. Or. May 16, 2018).

## CONCLUSION

For the above reasons, defendants' Motion to Dismiss (ECF No. 18) should be GRANTED without leave to amend.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due within 14 days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within 14 days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED: October 25, 2024

_____
JEFF ARMISTEAD
United States Magistrate Judge